WAGNER CHOI & VERBRUGGE
Attorneys at Law

JAMES A. WAGNER
745 Fort Street, Suite 1900
Honolulu, Hawaii 96813
Telephone: (808) 533-1877
Fax: (808) 566-6900
Email: jwagner@hibklaw.com

Attorney for Debtor
and Debtor-in-Possession

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re | Case No. 11-00981 |
| | (Chapter 11) |
| LV KAPOLEI 54, LLC, | |
| Debtor and Debtor-in-possession. | |

## DEBTOR'S SUBMISSION OF FIRST AMENDED DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION

LV KAPOLEI 54, LLC, debtor and debtor-in-possession ("Debtor"),

by and through its undersigned counsel, hereby submits redlined copies of the

Debtor's First Amended Disclosure Statement for Chapter 11 Plan of

Reorganization Dated June 17, 2011 and First Amended Chapter 11 Plan of

Reorganization for LV Kapolei 54, LLC Dated as of June 17, 2011. The First

66930

Amended Disclosure Statement and Plan are submitted in redline copies for the convenience of the Court and other parties in interest. The Debtor intends to file final First Amended Disclosure Statement and First Amended Plan at the conclusion of the hearing on the Debtor's Disclosure Statement in order to incorporate the comments of the Court and other parties in interest.

The attached redlined copies incorporate certain revisions requested by the Office of the United States Trustee and the addition of Class 5 - Real Property Tax Claims as one of the Debtor's classes of creditors. Exhibit "B," Financial Forecast to the Disclosure Statement, has also been revised to increase the amount of real property taxes to be paid at closing of the Hawaiian Dredging Sale.

DATED: Honolulu, Hawaii, July 6, 2011.

/s/ James A. Wagner
JAMES A. WAGNER
Attorney for Debtor and
Debtor-in-Possession

WAGNER CHOI & VERBRUGGE
Attorneys at Law

JAMES A. WAGNER
ALLISON A. ITO
745 Fort Street, Suite 1900
Honolulu, Hawaii 96813
Telephone: (808) 533-1877
Fax: (808) 566-6900
Email: jwagner@hibklaw.com
aito@hibklaw.com

Attorneys for Debtor
and Debtor-in-Possession

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>LV KAPOLEI 54, LLC,<br><br>        Debtor and<br>        Debtor-in-possession. | Case No. 11-00981<br>(Chapter 11)<br><br>Disclosure Statement Hearing<br><br>DATE: _____<br>TIME: _____<br>JUDGE: Hon. Robert J. Faris |

**<u>FIRST AMENDED</u>**
**DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN OF**
**REORGANIZATION DATED JUNE 17, 2011, FILED BY DEBTOR;**
**EXHIBITS "A" AND "B"**

66931

# I.   INTRODUCTION

LV KAPOLEI 54, LLC, the debtor and debtor-in-possession herein (the "Debtor") has filed a chapter 11 plan of reorganization (the "Plan") to provide for the Debtor to emerge from bankruptcy.  A copy of the Plan is attached hereto as Exhibit A.  This Disclosure Statement is being sent to you to help you to make an informed judgment about the Plan, and to solicit your acceptance of the Plan. Unless otherwise defined herein, all capitalized terms contained herein shall have the meanings ascribed to them in the Plan.

The Debtor believes that the Plan provides the greatest and earliest possible recovery to holders of Allowed Claims, that acceptance of the Plan is in the best interests of all parties, and that any alternative would result in further delay, uncertainty, expense, and, smaller distributions to holders of Allowed Claims. The Debtor believes the acceptance, confirmation and implementation of the Plan is in the best interests of creditors of the Debtor.

The United States Bankruptcy Court for the District of Hawaii (the "Bankruptcy Court") has scheduled a hearing on _____, at _____ to consider whether to confirm the Plan.

On _____, 2011, after notice and a hearing held on _____,

the Bankruptcy Court signed an order approving this Disclosure Statement as

containing adequate information of a kind and in sufficient detail to enable

hypothetical, reasonable investors typical of the Debtor's creditors to make an

informed judgment whether to accept or reject the Plan.

The Disclosure Statement order sets forth deadlines for voting to accept or

reject the Plan and procedures to be followed to object to confirmation of the Plan.

A ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure

Statement that is submitted to the holders of Claims whom are entitled to vote to

accept or reject the Plan. In addition, voting instructions accompany each ballot.

Attached as Exhibits to this Disclosure Statement are copies of the

following:

- The Plan (Exhibit A);
- The Debtor's Financial Forecast for the three year period of the Plan

(the "Financial Forecast") (Exhibit B).

Additional documents will be submitted as part of the Plan Supplement prior

to the Confirmation Hearing.

## A. Purpose of Disclosure Statement

The Bankruptcy Code requires that a proponent of a reorganization plan

prepare and file with the Bankruptcy Court a "disclosure statement" that provides

information of a kind, and in sufficient detail, that would enable a typical holder of claims or equity interests in a class impaired under that plan to make an informed judgment with respect to the plan. This Disclosure Statement provides such information, as well as information regarding the deadlines for casting ballots with respect to the Plan, the deadlines for objecting to confirmation of the Plan, the requirements that must be satisfied in order for the Bankruptcy Court to confirm the Plan, and other relevant information. Parties in interest should read this Disclosure Statement, the Plan, and all of the accompanying exhibits in their entirety in order to determine:

- How the Plan will affect their Claims against and Equity Interests in the Debtor;

- Their rights with respect to voting for or against the Plan;

- Their rights with respect to objecting to confirmation of the Plan; and

- How and when to cast a ballot with respect to the Plan.

The Disclosure Statement, however, cannot and does not provide holders of Claims and Equity Interests with legal or other advice. You should consult with your lawyers and/or financial advisors to obtain specific advice regarding how the Plan will affect you and regarding your best course of action with respect to the Plan.

## B. Holders of Claims and Interests Entitled to Vote

Holders of Claims in Classes 1, 2, and 3 (collectively the "Voting Classes") are entitled to vote on the Plan because such Classes are: (i) impaired under the Plan within the meaning of section 1124 of the Bankruptcy Code; and (ii) may receive distributions of property under the Plan and therefore are not deemed to have rejected the Plan under Section 1126(g) of the Bankruptcy Code.

Each holder of an Allowed Equity Interest in Class 4 is deemed to have accepted the Plan because holders of Allowed Equity Interest in Class 4 are unimpaired.

The Bankruptcy Court may confirm the Plan only if at least one Class of impaired Claims has voted to accept the Plan (without counting the votes of any insiders whose Claims are classified within that Class) and if certain statutory requirements are met as to both non-consenting members within a consenting Class and as to dissenting Classes. A Class of Claims has accepted the Plan only when at least one-half in number and at least two-thirds in amount of the Claims actually voting in that Class vote in favor of the Plan.

In the event of a rejection of the Plan by one or more Voting Classes, the Debtor intends to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, which permits confirmation notwithstanding such rejection if the Bankruptcy Court finds that the

66931

5

Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the rejecting Classes.

## C. Voting Procedures

### 1. Voting Procedures And Deadlines

The Debtor has provided copies of this Disclosure Statement and ballots (which include detailed voting instructions) to all known holders of impaired Claims in the Voting Classes. Those holders of a Claim in a Voting Class who seek to vote to accept or reject the Plan must complete the enclosed ballot and return it to:

> Wagner Choi & Verbrugge
> James A. Wagner
> 745 Fort Street, Suite 1900
> Honolulu, Hawaii 96813
> Telephone: (808) 533-1877

so that it actually is received by no later than the Balloting Deadline (as defined below). Creditors are encouraged to read and review their ballots carefully.

**All ballots must be completed, signed, returned to, and actually received by Wagner Choi & Verbrugge by no later than _____, 2011, at 4:00 p.m., Hawaiian Standard Time (the "Balloting Deadline").** Ballots received after the Balloting Deadline, and ballots returned directly to the Bankruptcy Court, will not be counted in connection with confirmation of the Plan.

**2.    Date Of The Confirmation Hearing And Deadlines For Objection To Confirmation Of The Plan**

The hearing to determine whether the Bankruptcy Court will confirm the Plan (the "Confirmation Hearing") will commence on _____, 2011, at _____ in the Courtroom of the Honorable Robert J. Faris, United States Bankruptcy Judge for the District of Hawaii.  The Confirmation Hearing may be continued from time to time by announcement in open court without further notice.

Any objections to confirmation of the Plan must be filed with the Bankruptcy Court and served on the following entities no later than _____:

> (a)  LV Kapolei 54, LLC, One Embarcadero Center, Suite 2405, San Francisco, California 94111, Attention: Mark Whiting

> (b)  Wagner Choi & Verbrugge, Topa Financial Tower, 745 Fort Street, Suite 2900, Honolulu, Hawaii 96813.  Counsel to Debtor;

> (c)  Office of the United States Trustee, Attention: Curtis B. Ching, Esq., 1132 Bishop Street, Suite 602, Honolulu, Hawaii 96813.

Objections that are not timely filed and served may not be considered by the Bankruptcy Court.  Please refer to the accompanying notice of the Confirmation Hearing for specific requirements regarding the form and nature of objections to confirmation of the Plan.

**3.** Important Notice And Cautionary Statement

The historical financial data relied upon in preparing the Plan and this Disclosure Statement are based upon the Debtor's books and records. The liquidation analysis, estimates, projections, and other financial information referenced in this Disclosure Statement or attached hereto as exhibits have been developed by the Debtor and its professional advisors. Although these professional advisors assisted in the preparation of this Disclosure Statement, in doing so such professionals relied upon factual information and assumptions regarding financial, business, and accounting data provided by the Debtor and third parties, most of which information has not been audited. The professional advisors of the Debtor have not independently verified such information and, accordingly, make no representations as to its accuracy. Moreover, although reasonable efforts have been made to provide accurate information, the Debtor cannot warrant or represent that the information in this Disclosure Statement, including any and all financial information, is without inaccuracy or omissions, or that actual values or distributions will comport with the estimates set forth herein.

No Person may rely upon the Plan or this Disclosure Statement or any of the accompanying exhibits for any purpose other than to determine whether to vote in favor of or against the Plan. Nothing contained in such documents constitutes an admission of any fact or liability by any party, and no such information will be

admissible in any proceeding involving the Debtor or any other Person, nor will this Disclosure Statement be deemed evidence of the tax or other legal effects of the Plan on holders of Claims or Equity Interests in the Bankruptcy Case.

## II.    BACKGROUND INFORMATION

### A.    History and Events Leading to Bankruptcy

The Debtor was formed as a Delaware limited liability company on February 22, 2005, for the purpose of acquiring, subdividing, improving, marketing, and selling approximately 53.71 acres of industrial land, constituting Phase 2 of the Kapolei Business Park (the "Property"). The Debtor was fully capitalized in the amount of $12 million by its original members.

The Debtor entered into a Purchase and Sale Agreement to acquire the Property from KBP Land Partners, LLC, a Delaware limited liability company for a purchase price of $22.5 million. At the time the Debtor acquired the property, it also acquired the rights of Declarant and Plan Coordinator for Phase 1 of the Kapolei Business Park which had been completed by the prior owners. It was contemplated upon the completion of Phase 2 of the Kapolei Business Park that Phase 1 and Phase 2 would be joined into a single owners' association.

The purchase from KBP Land Partners closed on April 15, 2005. On the same day, the Debtor closed on a loan from Bank of Hawaii in the amount of

$23,960,000 to provide funding for the balance of the purchase price and to provide operating capital.

The project, as originally contemplated, was to develop and sell a 57 lot subdivision over a three year period for a total project cost of approximately $35 million. The total estimated sales were approximately $50 million.

On February 22, 2008, the Debtor entered into a Loan Agreement with Central Pacific Bank ("CPB") to borrow $21,450,000 pursuant to a Note and Mortgage of the same date. The CPB loan proceeds were used to retire the Bank of Hawaii loan and for operating capital.

The project moved forward with initial planning, design, subdivision approval, and permitting for the contemplated development. In addition, mass grading was completed on 50% of the site. However, the changing economic climate in 2008 and the subsequent financial crash that occurred disrupted the Debtor's efforts to achieve sales of the proposed subdivision lots, refinance of the CPB loan, and provide capital to complete the infrastructure.

On March 22, 2010, CPB elected to file a foreclosure action against the Debtor. Although the Debtor in good faith entered into protracted settlement and restructuring discussions with CPB which continued until shortly before the Debtor's Chapter 11 filing, the parties were unable to reach a mutually agreeable restructuring. A public auction of the Property was held on March 23, 2011, in the

foreclosure proceeding. The high bidder at the auction was CPB with a bid of $16,000,000.

As a result of the failure of the efforts to restructure the CPB loan, the Debtor filed for relief under Chapter 11 of the Bankruptcy Code on April 8, 2011, commencing these proceedings.

**B.    Post-Confirmation Payment of U.S. Trustee's Quarterly Fees**

The Debtor shall pay any and all accrued post-petition U.S. Trustee's quarterly fees, including any such fees that accrue after the confirmation of the Plan.

**C.    Post-Confirmation Management**

The current manager of the Debtor, Lokahi KBP, LLC, will continue to manage the Debtor post-confirmation. Lokahi Ventures, LLC, a Colorado limited liability company, the members of which are Lambert Capital Corporation and Makena Holdings, LLC, is the Manager of Lokahi KBP, LLC. Paul Lambert is the President of Lambert Capital Corporation and Mark Whiting is the sole member/manager of Makena Holdings, LLC.

Lokahi KBP, LLC will be compensated in accordance with the terms of the Development Management Agreement, dated March 2005, to be assumed by the Debtor, a copy of which is attached as Exhibit "D" to the Plan Supplement.

66931                                    11

## III.     SUMMARY OF THE PLAN

The Discussion of the Plan set forth below is qualified in its entirety by reference to the Plan, the terms of which are controlling.  Holders of Claims and Interests and other interested parties are urged to read the Plan in its entirety so that they may make an informed judgment concerning the Plan.

### A.     Classification and Treatment of Claims and Equity Interests

The Plan provides for the treatment of four Classes of Claims and one Class of Equity Interests.  The treatment of Claims described below applies only to Allowed Claims and Equity Interests.  Claims that are the subject of a pending objection before the Bankruptcy Court or other pending litigation, or that have not been allowed pursuant to a Final Order of the Bankruptcy Court, will receive distributions under the Plan only if and after they become Allowed Claims.  The Reorganized Debtor retains the right to initiate proceedings to subordinate or otherwise object to Claims prior to the proposed deadline of 180 days from the Effective Date.

### 1.     Administrative Expenses (Unclassified Claim)

The Plan provides that the Reorganized Debtor shall pay to each holder of an Allowed Administrative Expense Claim, Cash in an amount equal to such Allowed Administrative Expense on the later of (i) within 30 days of the Effective Date; (ii) the date such Administrative Expense becomes an Allowed Administrative

Deleted: three

Deleted: and

Expense Claim, or (iii) on such different terms as may be acceptable to the holder

of the Allowed Administrative Expense Claim.  In the case of goods and services

Deleted: s

provided to the Debtor in the ordinary course of its business during the Chapter 11

Case from the Petition Date through and including the Effective Date in the

ordinary course of business, such ordinary course of business Administrative

Expenses shall be paid upon the date upon which such liability is payable in the

ordinary course of the Debtor's business, consistent with the current agreement of

the parties.

The Confirmation Order shall contain a bar date for purposes of assertion

and allowance of Administrative Expense Claims, other than Administrative

Expenses which are Ordinary Course Administrative Expenses.  The Confirmation

Order shall also contain a deadline for the Reorganized Debtor to object to

Administrative Expense Claims, including Ordinary Course Administrative

Expenses.

2.    **Class 1:    Allowed CPB Secured Claim**

**2.1.1  Classification:**  Class 1 consists of the Allowed CPB Secured

Claim.

**2.1.2  Treatment:**   Unless CPB and the Debtor agree to a different

treatment, the CPB Promissory Note and CPB Mortgage shall be modified on the

Effective Date as follows (hereinafter referred to as the "Modified Note and Modified Mortgage"):

2.1.2.1     The Maturity Date shall be extended to a date that is the third anniversary of the Effective Date.

2.1.2.2     The principal amount of the Modified Note shall be an amount equal to the amount outstanding under the CPB Note and CPB Mortgage as of the Effective Date (estimated to be approximately $23,500,000, as of September 1, 2011).

2.1.2.3     the Debtor shall make monthly interest only payments on the Modified Note commencing on the thirtieth (30th) day after the Effective Date and monthly on the same day of the month thereafter until the Modified Note is paid in full or matures.

2.1.2.4     The interest rate on the Modified Note shall be four percentage (4%) points above the 30-day LIBOR rate.

2.1.2.5     There shall be no rebalancing requirement.

2.1.2.6     The release price for a partial release of the Modified Mortgage shall be an amount equal to 125% of par value on the then net saleable area, provided, however, that the release price for Unit 3 upon the sale to Hawaiian Dredging shall be the net proceeds of sale, approximately $1,647,000.

Class 1 is impaired, and CPB is entitled to vote to accept or reject the Plan.

**3.    Class 2:    Allowed General Unsecured Claims**

**3.2.1    Classification:**  Class 2 consists of Allowed General Unsecured Claims.

**3.2.2    Treatment:**  Holders of Allowed General Unsecured Claims shall be paid in full their Allowed Claims with interest at the rate of 6% per annum in eight equal quarterly installments, beginning on the ninetieth day after the Effective Date, and ending on the second anniversary date of the Effective Date. There are six holders of Class 2 claims as identified on Exhibit "A" to the Plan.

Class 2 is impaired, and the holders of Allowed Claims in Class 2 are entitled to vote to accept or reject the Plan.

**4.    Class 3:    Allowed Subordinated Claims**

**4.3.1 Classification:**  Class 3 consists of the Allowed Claims that are Subordinated Claims pursuant to the Plan.  There are eight holders of Allowed Subordinated Claims as identified on Exhibit "B," attached to the Plan.

**4.3.2 Treatment:**  Holders of Allowed Subordinated Claims shall receive payment in full or pro rata in accordance with return provided them under the Debtor's Operating Agreement, provided that the members of Class 1 and Class 2 have first been paid in full.

Class 3 is impaired and the holders of Subordinated Allowed Claims in Class 3 are entitled to accept or reject the Plan.

**5.      Class 4:      Allowed Equity Interests in Debtor**

**5.4.1    Classification:**  Class 11 consists of the Allowed Equity Interests in Debtor.

**5.4.2    Treatment:**  The holder of the Allowed Equity Interests in the Debtor are unimpaired and shall retain their equity interest in the Debtor in accordance with the terms of the Debtor's Operating Agreement.  The holders of Allowed Equity Interests are listed on Exhibit "C" to the Plan.

Class 4 is unimpaired, and the holder of an Allowed Equity Interest in the Debtor is deemed to accept the Plan.

**6.      Class 5:      Real Property Tax Claims**

**6.5.1   Classification:**  Class 5 consists of the Allowed Real Property Tax Claims of the City and County of Honolulu.

**6.5.2   Treatment:**  The Real Property Tax Claims will be paid in full at closing of the Hawaiian Dredging Sale.  The Real Property Tax Claims totaled $644,876.47 as of the Petition Date.

Deleted: 11

Formatted: Font: Bold

Formatted: Indent: First line:  0"

Formatted: Font: Bold

Formatted: Font: Bold

### III. MEANS OF IMPLEMENTING THE PLAN

**1. Funding**

The Plan contemplates that additional capital in the amount of approximately $1,700,000, will be required to carry out the terms of the Plan. Funding shall be by way of continued capital contributions from the Debtor's members pursuant to the terms of the Capital Contribution Funding Agreement, attached as Exhibit "D" to the Plan.

**2. Condominium Plan**

The Debtor shall record the Declaration of Condominium Property Regime of Kapolei Business Park Phase 2 substantially in the form attached to the Plan Supplement as Exhibit "A" and the Bylaws of the Association of Unit Owners of Kapolei Business Park Phase 2, substantially in the form attached to the Plan Supplement as Exhibit "B." The Condominium Plan creates nine units as more fully described in the Declaration. The Declaration reserves to the Developer the right to reconfigure the Units as necessary to facilitate the continued development and sale of the Property. These rights allow the developer the flexibility to create units of varying sizes to adapt to market conditions.

**3. Executory Contracts**

The Debtor will assume the following agreements:

(i)     Exclusive Agreement to Market Real Estate dated February 21, 2008, between Colliers Monroe Friedlander, Inc. ("Colliers") and the Debtor, a copy of which is attached to the Plan Supplement as Exhibit "C," pursuant to which Colliers has and will continue to provide marketing and sales services to the Debtor.

(ii)    Development Management Agreement dated March 2005, by and between the Debtor, as Owner, and Lokahi Ventures, LLC ("Lokahi"), as Developer, a copy of which is attached to the Plan Supplement as Exhibit "D," pursuant to which Lokahi provides certain development management to the Debtor.

(iii)   Management Agreement dated July 1, 2009, by and between the Debtor, as Owner, and Avalon Development Company, as Manager, a copy of which is attached to the Plan Supplement as Exhibit "E," pursuant to which Avalon provides certain management services to the Debtor.

(iv)    Purchase and Sale Agreement dated February 28, 2011, as amended, by and between the Debtor, as Seller, and Hawaiian Dredging Construction Company, Inc., as Buyer, a copy of which without exhibits is attached to the Plan Supplement as Exhibit "F," pursuant to which Dredging will acquire Unit 3 of the Condominium and, inter alia, construct Driveway "A" as shown on the Condominium Plan.

(v)     That certain Letter Agreement, dated April 1, 2010, by and between Hawaiian Electric Company, Inc. and the Debtor, as amended and extended by the parties, a copy of which is attached to the Plan Supplement as Exhibit "I."

**4.     Continued Sale of Units**

(i)     Within thirty (30) days of the Effective Date, the Debtor shall close the Hawaiian Dredging Sale, subject to such reasonable extension of the closing date as agreed to by the parties.

(ii)     The Debtor shall continue the marketing and sale of the remaining units, subject to such reconfiguration of the units as the Debtor may elect, until all such units are sold and the proceeds distributed in accordance with the Plan.

**5.     363 Sale**

In the event all of the Property has not been sold and the Class I claim has not been paid in accordance with the terms of the Plan within thirty-six (36) months of the Effective Date, then in such event, unless Class I otherwise consents, the remaining units shall be sold at public auction, pursuant to Section 363 of the Code within ninety (90) days of the expiration of the thirty-six (36) month period. Said auction shall be conducted upon motion by the Debtor in open court and without an upset price.

6.     **Time and Method of Distributions Under the Plan**

The Reorganized Debtor shall serve as the disbursing agent to hold and distribute Cash and such other property as may be distributed pursuant to the Plan.

7.     **Provisions for Treatment of Disputed Claims**

Notwithstanding all references in the Plan to Claims that are Allowed, in undertaking the calculations concerning Allowed Claims or Allowed Administrative Expense Claims under the Plan, including the determination of the amount or number of distributions due to the holders of Allowed Claims and Allowed Administrative Expense Claims, each Disputed Claim shall be treated as if it were an Allowed Claim or Allowed Administrative Expense Claim for purposes of voting on the Plan, except that if the Bankruptcy Court estimates the likely portion of a Disputed Claim to be Allowed or authorized or otherwise determines the amount or number which would constitute a sufficient reserve for a Disputed Claim (which estimates and determinations may be requested by the Reorganized Debtor), such amount or number as determined by the Bankruptcy Court shall be used as to such Claim. Objections to Claims must be filed and served within 180 days of the Effective Date.

8.     **Discharge of the Debtor and Injunction**

Except as provided in the Plan or Confirmation Order, the rights afforded hereunder and the treatment of Claims, Administrative Expense Claims and

Interests under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims and Administrative Expense Claims and termination of all Interests, including any interest accrued on Claims from the Petition Date. Except as provided in the Plan or the Confirmation Order, confirmation will discharge the Debtor and Reorganized Debtor from all Claims, Administrative Expense Claims or other debts that arose before the Confirmation Date and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (c) the holder of a Claim or Administrative Expense Claim based on such debt has accepted the Plan. As of the Confirmation Date, except as provided in the Plan or the Confirmation Order, all Entities shall be precluded from asserting against the Debtor, the Reorganized Debtor, their successors or their property, any other or further claims, debts, rights, causes of action, liabilities or equity interests based upon any act, omission, transaction or other activity of any nature that occurred prior to the Confirmation Date.

**9.  Retention of Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor, to the extent set forth below, and its successors, any assigns

hereunder and future assigns will retain and may exclusively enforce any rights of action subject only to any express waiver or release thereof in the Plan or in any other contract, instrument, release, indenture or other agreement entered into in connection with the Plan, and the Confirmation Order's approval of the Plan shall be deemed a *res judicata* determination of such rights to retain and exclusively enforce such rights of action unless the Bankruptcy Court orders otherwise. Absent such express waiver or release, the Reorganized Debtor, or its successors or assigns may pursue rights of action, as appropriate, in accordance with the best interests of the Reorganized Debtor (or its successors or future assigns).

10. **Exemption from Transfer Taxes**

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from the Debtor to the Reorganized Debtor or any other Person pursuant to the Plan including (a) the issuance of any stock, (b) the creation of any mortgage deed or trust, or other security interest, and (c) the making of any agreement or instrument in furtherance of, or in connection with, this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment.

**IV. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

The discussion below summarizes certain anticipated U.S. Federal income tax consequences of the Plan to the Debtors and certain Holders of Claims or Interests. This summary is provided for information purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Code"), Treasury regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect, that could adversely affect the U.S. Federal income tax consequences described below.

This summary does not address all aspects of U.S. Federal income taxation that may be relevant to a particular Holder of a Claim or Interest in light of its particular facts and circumstances or to certain types of Holders of Claims or Interests subject to special treatment under the Code (for example, non-U.S. taxpayers, financial institutions, broker-dealers, life insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, grantor trusts, persons holding a Claim as part of a "hedging," "integrated," or "constructive" sale or straddle transaction, persons holding claims through a partnership or other pass-through entity and persons that have a "functional currency" other than the U.S. dollar. This summary does not address the tax considerations applicable to Holders who obtained their Claims or Interests (or the rights underlying such Claims or Interests) in connection with the

66931                                23

performance of services. In addition, this summary does not discuss any aspects of state, local, or non-U.S. taxation, nor does this summary address the U.S. Federal income tax consequences to Holders of Claims that are unimpaired under the Plan and Holders of Claims that are not entitled to receive or retain any property under the Plan.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE PLAN PROPONENTS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE PLAN PROPONENTS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A. **U.S. Federal Income Tax Consequences to the Debtor and Holders of Interests**

1. **Tax Consequences to Debtor**.

The Debtor is a limited liability company ("LLC") taxed as a pass-through entity for U.S. federal income tax purposes. As a result, there are no tax consequences to the Debtor.

2. **Tax Consequences to Holders of Interests.**

If any direct or indirect owner of the Debtor is itself a pass-through entity such as a partnership, LLC or S corporation, the income will again be passed through to the owners of that direct or indirect owner, and so on until income is allocated to an individual or to an entity that is not a pas-through for tax purposes.

Such Holders of Interests or their direct and indirect owners that are not pass-through entities for U.S. federal income tax purposes may be required to recognize income or gain as a result of the Plan, and should consult their own tax advisors regarding the tax consequences of the Plan.

B. **U.S. Federal Income Tax Consequences to Holders of Claims**

The U.S. Federal income tax consequences to Holders of Claims arising from the distributions to be made in satisfaction of their Claims pursuant to the Plan may vary, depending upon, among other things: (a) the type of consideration received by the Holder of a Claim in exchange for the Claim; (b) the nature of the indebtedness owed to it; (c) whether the Holder has previously claimed a bad debt

or worthless security deduction in respect of its Claim; (d) whether such Claim constitutes a security; (e) whether the Holder of a Claim is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. Federal income tax on a net income basis; (f) whether the Holder of a Claim reports income on the accrual or cash basis; and (g) whether the Holder of a Claim receives distributions under the Plan in more than one taxable year. For tax purposes, the modification of a Claim may represent an exchange of the Claim for a new Claim, even though no actual transfer takes place. In addition, where gain or loss is recognized by a Holder of a Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder and how long the Claim has been held or is treated as having been held, whether the Claim was acquired at a market discount, and whether and to what extent the Holder previously claimed a bad debt or worthless stock or securities deduction with respect to the underlying Claim. A Holder who purchased its Claim from a prior holder at a discount to its face amount may be subject to the market discount rules of the Code. Under those rules, assuming that the Holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a *de minimis* rule) generally

would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

## 1. General Treatment of Holders of Claims

Pursuant to the Plan, the Debtors will transfer assets of the Debtors, either directly or indirectly, to holders of Allowed Claims in satisfaction and discharge of such Claims. Holders of such Claims will likely recognize gain or loss equal to the amount realized under the Plan in respect of their Claims less their respective tax bases in their Claims. The amount realized for this purpose will generally equal the sum of the cash and the fair market value of any other consideration received under the Plan in respect of their Claims. Any gain or loss recognized in the exchange will be capital or ordinary depending on the status of the Claim in the Holder's hands.

To the extent that cash received or deemed received by a Holder of a Claim is attributable to accrued interest on the Claim, the cash will be deemed made in payment of such interest. The federal income tax laws are unclear on how much consideration will be deemed attributable to accrued interest when partial payments are made on a debt on which both principal and interest are owed. To the extent that the Holder of a Claim has not yet included the accrued interest in gross income, the cash deemed received in payment of such interest will generally be included in the Holder's gross income for federal income tax purposes. To the

extent the Holder has previously included accrued interest on the Claim in gross income, the cash deemed received in payment of such interest generally will not be included in gross income. The Holder of an Allowed Claim may be able to claim a deductible loss if the cash deemed received for the accrued interest is less than the amount the Holder had previously included in gross income.

2.    Bad Debt Deduction

The Holder of an Allowed Claim who under the Plan will receive in respect of a Claim an amount less than the Holder's tax basis in such Claim may be entitled to a bad debt deduction under section 166(a) of the Code. The rules regarding the ability of a taxpayer, who believes that a debt owed to it will not be collected in full to take a deduction related to such debt's partial or total worthlessness are very complex. Moreover, the application and impact of such rules vary greatly depending upon a taxpayer's individual circumstances, including the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed. Holders of Claims are therefore urged to consult their tax advisors with respect to the allowability of such a deduction.

**3.    Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN POTENTIAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR INDIVIDUALLY TAILORED TAX

ADVICE FROM A COMPETENT TAX ADVISOR. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES OF THE PLAN ARE IN MANY CASES COMPLEX, UNCLEAR AND UNCERTAIN AND MAY VARY DEPENDING ON A NUMBER OF DIFFERENT FACTORS, INCLUDING A CLAIMHOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIMHOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## V. FEASIBILITY OF THE PLAN AND BEST INTEREST OF CREDITORS

### A. Feasibility of the Plan

The Bankruptcy Code requires that the Bankruptcy Court determine that confirmation of a Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors. For purposes of showing that the Plan meets this feasibility standard, the Debtor has analyzed the ability of the Debtor to meet its obligations under the Plan and retain sufficient liquidity and capital resources to conduct its business. At the Confirmation Hearing, the Debtor will be prepared to demonstrate that the Plan is feasible.

To support the belief in the feasibility of the Plan, the Debtor has relied upon pro forma financial forecasts prepared by the Debtors for the period of the Plan

29

(the "Financial Forecasts"), which are set forth in Exhibit "B" of this Disclosure Statement. The Financial Forecasts indicate that the Debtor should have sufficient cash flow to pay and service debt obligations and to fund its operations. The Financial Forecast shows that over the three year life of the Plan, sufficient revenue will be generated to pay all of the Debtor's operating and development costs, pay the claims of Classes 1, 2, and 3 in full and leave a surplus of approximately $10,000,000 for the Equity Interests. Accordingly, the Debtor believes that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

The Financial Forecasts assume that (i) the Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material change in legislation or regulations, or the administration thereof, including environmental legislation or regulations, that will have an unexpected effect on the operations of the Debtor, (iii) there will be no change in the United States regarding generally accepted accounting principles that will have a material effect on the reported financial results of the Debtor, and (iv) there will be no material contingent or unliquidated litigation or indemnity claims applicable to the Debtor. To the extent that the assumptions inherent in the Financial Forecasts are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and considered reasonable by the

Debtor when taken as a whole, the assumptions and estimates underlying the Financial Forecasts are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of the Debtor. Accordingly, the Financial Forecasts are only estimates that are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Financial Forecasts will not be realized and that actual results will vary from the Financial Forecasts, which variation may be material. The Financial Forecasts should therefore not be regarded as a representation by the Debtor or any other person that the results set forth in the Financial Forecasts will be achieved. In light of the foregoing, readers are cautioned not to place undue reliance on the Financial Forecasts.

**B.    Acceptance of the Plan**

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two thirds (2/3) in dollar amount and more than one half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. For example, Class 2 General Unsecured Creditors votes to accept the Plan only if

two thirds (2/3) in amount and a majority in number actually voting in such Class cast their Ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan.

### C.    Best Interests Test

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a Bankruptcy Court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a Bankruptcy Court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtors were liquidated under chapter 7 under the Bankruptcy Code, a bankruptcy court must first determine the aggregate dollar amount that would be generated from such debtors' assets if their chapter 11 cases were converted to chapter 7 cases. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtors' assets by a chapter 7 trustee.

66931                                    32

Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

### D.     Liquidation Analysis

The Debtor assumes that if this case were converted to a proceeding under Chapter 7 that, given the amount of the CPB Secured Claim, the Trustee would abandon the Property or the Court would lift the stay and allow CPB to proceed with its foreclosure.  In a foreclosure sale, there would be no proceeds for unsecured creditors or interest holders.

### E.     Application of the 'Best Interests' of Creditors Test to the Liquidation Analyses

The Debtor believes that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied because the Debtor believes that the members of each Impaired Class will receive greater or equal value under the Plan than they would receive in a liquidation. Although the Debtor believes that the Plan meets the "best interests test" of section 1129(a)(7) of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will determine that the Plan meets this test.

66931

33

## F. Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative

In view of a potential rejection by certain holders of Claims, the Debtor may have to seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. The Bankruptcy Court may confirm a plan at the request of the Debtor if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

The Debtor believes the Plan does not discriminate unfairly with respect to holders of Class 1, Class 2, and Class 3 Claims or Holders of Interests in Class 4.

A plan is fair and equitable as to a class of secured claims that rejects a plan if, among other things, the plan provides (a)(i) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (ii) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of

such holder's interest in the estate's interest in such property; (b) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a)(i) or (a)(ii) of this subparagraph; or (c) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (i) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all. A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (i) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (ii) that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property at all.

66931

35

The Debtor believes that it will meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to Holders of Class 1, Class 2, and Class 3 Claims and Class 4 Interests.

## VI. RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtor believes that the confirmation of the Plan is preferable to all other alternatives. Consequently, the Debtor urges all holders of Claims in voting Classes to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before the voting deadline.

DATED: Honolulu, Hawaii, June 17, 2011.


LV KAPOLEI 54, LLC

_____
Mark S. Whiting